**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| TOFFLER ASSOCIATES, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 08-1167 |
| | : | |
| v. | : | |
| | : | |
| HARTFORD FIRE INSURANCE COMPANY, | : | |
| | : | |
| Defendant | : | |


**MEMORANDUM**

Jones, J.                                                                              July 29, 2009

Before the Court are the parties' cross-motions for summary judgment and the various

responses and replies thereto.  For the following reasons, Hartford Insurance Company's

("Hartford") Motion for Summary Judgment will be granted in part and denied in part and

Toffler Associates, Inc.'s ("Toffler") Cross-Motion for Summary Judgment will be granted in

part and denied in part.

**I.      Factual Background**

        A.        The Parties and Their Insurance Policy

        Toffler is a strategic consulting and advisory firm that provides consulting services to

corporations, the United States intelligence community, and United States military services.

(Hartford Mot. for Summ. J., Ex. 1, Jeffery Barnett Dep. ("Barnett Dep.") at 17; Hartford Mot.

for Summ. J., Ex. 4, Scott McLauthlin Dep. at 12; Toffler Mot. for Summ. J., Ex. 1, Thomas H.

Johnson Dep. at 19-20.)  In 2006, Toffler purchased an insurance policy ("Policy") from

Hartford.  (See Hartford Mot. for Summ. J., Ex. 33, Business Liability Coverage Form, Policy No. 08 SBA PR0042 ("Policy").)  The Policy was effective from August 10, 2006, through August 10, 2007, and included Business Liability Coverage against damages because of "personal or advertising injury."  (Policy ¶ A(1)(a).)  According to the Policy, advertising injury includes "[i]infringement of copyright, slogan, or title of any literary or artistic work, in your 'advertisement.' " (Policy ¶ G(17)(g).)  The Policy defines advertisement as the following:

> "Advertisement" means the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:
>
>      a.    (1)    Radio;
>
>               (2)    Television;
>
>               (3)    Billboard;
>
>               (4)    Magazine;
>
>               (5)    Newspaper;
>
>      b.    The Internet, but only that part of a web site that is about goods, products or services for the purposes of inducing the sale of goods, products or services; or
>
>      c.    Any other publication that is given widespread public distribution.
>
> However, "advertisement" does not include:
>
>      a.    The design, printed material, information or images contained in, on or upon the packaging or labeling of any goods or products; or
>
>      b.    An interactive conversation between or among persons through a computer network.

(Policy ¶ G(1).)

       B.      <u>The Underlying Copyright Action</u>

In May 2007, Inside Washington Publishers, LLC ("IWP") informed Toffler of its belief that Toffler had violated certain of IWP's copyrights by reproducing IWP's articles in a Publication titled *Toffler Associates' Morning Brew* ("the Publication").  (<u>See</u> Hartford Mot. for Summ. J., Ex. 13, Letter from Gregory to Westphal, May 7, 2007.)  IWP demanded that Toffler immediately cease and desist from any further reproduction of IWP's articles.  (<u>Id</u>.)  Toffler immediately ceased including any IWP publications in the Publication.  (<u>See</u> Hartford Mot. for Summ. J., Ex. 14, Letter from McLauthlin to Gregory, May 15, 2007.)  On August 16, 2007, IWP initiated a copyright infringement action against Toffler and Jeffrey R. Barnett, senior consultant at Toffler, in the United States District Court for the Eastern District of Virginia.  (Hartford Mot. for Summ. J., Ex. 7, IWP Compl.)  In its Complaint, IWP alleged that that "Toffler and/or Barnett selected and reproduced articles from [IWP's] Copyrighted Works and distributed the articles to many recipients in issues of a series entitled *Morning Brew*."  (IWP Compl. ¶ 12.)  IWP alleged that the May 2, May 7, and May 14, 2007, and "many other issues" of the Publication contained copyrighted articles.  (IWP Compl. ¶¶ 13-14.)  IWP alleged that Barnett prepared and distributed the infringing issues of the Publication within the scope of his employment by Toffler and that the infringing issues were distributed through a Toffler e-mail server.  (IWP Compl. ¶¶ 15-16.)  IWP also alleged that Barnett's toffler.com e-mail address appeared at the footer of the infringing issues of the Publication, and that recipients of those issues were instructed to contact Barnett via his toffler.com e-mail address.  (IWP Compl. ¶ 16.)  IWP sought injunctive relief and damages from Toffler.  (IWP Compl. 5.)

C.      The Publication

The Publication at issue in IWP's lawsuit was a twenty-page "compilation of newspaper journal articles, plus transcripts of hearings and maybe a television news show that was related to the defense industry, the intelligence industry and corporations."  (Barnett Dep. at 25.)  It was a free service, compiled and distributed by Barnett via e-mail every weekday morning.  (Barnett Dep. at 24-26, 34.)  Barnett started the Publication, then titled *Booz News*, in 1999, when he worked as a consultant for Booz Allen, and distributed it while working for Booz Allen through early 2003.  (Barnett Dep. at 10, 14, 75-76, 79; Hartford Mot. for Summ. J., Ex. 6, E-mail from McLauthlin to Serritella, May 31, 2007 ("McLauthlin 5/31/07 E-mail").)  Barnett left Booz Allen and began working for Toffler in February 2003, and he re-commenced distribution of the Publication shortly thereafter.  (Barnett Dep. at 10, 24-25.)  Distribution of the Publication ceased in May 2007.  (Barnett Dep. at 22.)

When Barnett first joined Toffler, the Publication contained no reference to Toffler other than Barnett's Toffler email address in the footnote.  (McLauthlin 5/31/07 E-mail.)  At that time, the Publication was called *Morning News*.  (McLauthlin 5/31/07 E-mail; Barnett Dep. at 34.)  About eighteen months before Barnett stopped distributing the Publication, the name changed from *Morning News* to *Morning Brew* because someone thought the new name would be catchier.  (Barnett Dep. at 34.)

Toffler has only been associated with the Publication since May 24, 2006, when Barnett added the byline "Compiled by Jeff Barnett, Toffler Associates."  (McLauthlin 5/31/07 E-mail; Barnett Dep. at 35; Hartford Mot. for Summ. J., Ex. 10, McLauthlin E-mail to Serritella, June 22, 2007 ("McLauthlin 6/22/07 E-mail") at 1-2 (quoting a June 22, 2007, e-mail from Serritella to

Gregory).)  Since the summer of 2006, the Publication also contained a "Toffler Associates" watermark on every page.  (Barnett Dep. 46; Toffler Cross-Mot. for Summ. J., Ex. 2, Jeffrey Barnett Dep. ("Barnett Dep. II") at 41.)  Beginning on November 7, 2006, Barnett added "Toffler Associates' Morning Brew" to the e-mail subject line when he sent out the Publication. (McLauthlin 5/31/07 E-mail.)  On January 26, 2007, Barnett changed the title of the Publication from *Morning Brew* to *Toffler Associates' Morning Brew*.  (McLauthlin 5/31/07 E-mail; Barnett Dep. at 34-35.  But see McLauthlin 6/22/07 E-mail at 2 (quoting a June 22, 2007, e-mail from Serritella to Gregory which states that this name change occurred in November 2006).)  From that point forward, the full title *Toffler Associates Morning Brew* appeared on the banner at the top of the first page.  (Barnett Dep. at 35.)  This change was intended to promote brand recognition for the firm and to indicate that the Publication was not something that Barnett was doing on his own.  (Barnett Dep. at 35; Johnson Dep. at 45.)  Barnett made the title and banner changes after consulting with Toffler's managing partner, Dick Szfranski, and Toffler's attorney, Scott McLauthlin.  (Barnett Dep. at 35; Johnson Dep. at 47.)  These changes were intended to link the Toffler name with articles the news.  (Johnson Dep. at 47-48.)

Beginning at some point prior to April  2007, the following text appeared in small print at the bottom of each page of the Publication:

> Published daily, the Morning Brew is a free service presenting open source articles of interest to leaders in national security and related fields.  All articles are subject to the copyright protections associated with the original sources.  Please provide questions and comments to Jeff Barnett at jbarnett@toffler.com

(Barnett Dep. at 43-44; Toffler Cross-Mot. for Summ. J., Ex. 5, *Morning Brew*, April 13, 2007.)

Articles in the Publication were organized according to titles of books written by Alvin

Toffler, co-founder of Toffler Associates.  (Barnett Dep. II. at 80-81; Toffler Cross-Mot. for

Summ. J., Ex. 3, Toffler Associates Web Site printout, "Our Founders."; Johnson Dep. at 44.)

This method of organization was intended to promote the Toffler brand and to promote Toffler's

business by indicating to readers of the Publication that Toffler has been "ahead of the game."

(Johnson Dep. at 44-47.)

  By May 2007, Barnett was sending the Publication to the e-mail addresses of 38 other

Toffler employees and about 300 persons in the defense industry, the intelligence community,

and corporate America.  (Barnett Dep. at 26; Barnett Dep. II at 31; McLauthlin 6/22/07 E-mail at

2 (quoting a June 22, 2007, e-mail from Serritella to Gregory).)  The e-mail list consisted current

and former Toffler clients, including former clients "who could circle back into government jobs

or into any jobs that could become clients."  (Barnett Dep. at 52-53; Barnett Dep. II at 69.)  When

Barnett joined Toffler in February 2003, he kept some recipients of the *Booz News* on the

Publication's email list, but he removed some recipients from whom he was never going to get

any business.  (Barnett Dep. at 77-78; McLauthlin 6/22/07 E-mail at 2 (quoting a June 22, 2007,

e-mail from Serritella to Gregory).)  Partners at Toffler would ask Barnett to add certain names to

the Publication distribution list.  (McLauthlin Dep. at 18-19.)  In Barnett's words, someone could

also get on the Publication distribution list in one of the following ways:

> [E]ither myself or a colleague would do an office call on a client or
> potential client and during the terms of the conversation an offer to
> put them – to include them on the distribution list of the *Morning
> Brew*.  I would get e-mails from people in the industry or, you
> know, on target group asking to be added.  I would meet people at
> a networking event and in order to stay in contact with them and to
> kind of regularly pulse them I would offer to put them on
> distribution. . . .  I believe those were the main ways.  So, it was a
> push and a pull.  Sometimes a request would come out of nowhere.

> People would be in an office where Joe is in an office, Joe was
> transferred somewhere else, Jen comes in and takes that job and
> Joe would tell Jen about the *Morning Brew* and Jen would ask to
> be put on the distribution.  So there's a hand-off mechanism also.
> Not a mechanism, per se.

(Barnett Dep. II at 27-28.)

The Publication did not alert the reader that Toffler was a consulting firm or tell the reader what services Toffler offered.  (Johnson Dep. at 48-49; McLauthlin Dep. at 29.)  The Publication did provide Barnett's contact information and included the Toffler name, which could cause the reader to an internet search and find the Toffler website.  (McLauthlin Dep. at 29.)  Alternatively, the reader was already familiar with other Toffler publications and could link Toffler's services with the news.  (Johnson Dep. at 49.)  According to Thomas H. Johnson, one of Toffler's co-founders,

> [I]n our business you – consulting is bought not sold.  It's an
> embarrassment to put selling literature into these kinds of things.
> That's – that's crass and it's what a hardware salesman – if you're
> selling soap, you might list the soap in here.  As consultants you
> list – for senior executives you list the idea that you had and you
> put the other stuff behind it and you let other – let you get the
> credit because of what others are saying.  And that's the whole
> idea. . . .  There's nothing that we say.  It's all about what the
> others say.  And what we're doing is saying we're smart, we know
> what is going on in this world, we're very familiar and understand
> the world and here is an example of – of people who are
> articulating these ideas.

(Johnson Dep. at 15, 49-50.)

Toffler did not enter any contracts with clients as a direct result of the Publication, but the Publication gave Toffler an entree to clients and persons with whom they did not have prior contracts.  (Barnett Dep. II at 64-65.)  According to Barnett,"[Toffler] got into people in my

opinion because of the existing link given us by [the Publication] and then when people had a

problem where they needed help, we were the first people that came to mind." (Barnett Dep. II at

65.)  Two recipients of the Publication contacted Barnett in response to receiving the Publication

by e-mail, met with Barnett and other Toffler staff, and later signed a contracts with Toffler.

(Barnett Dep. II at 65-67; Toffler Cross-Mot. for Summ. J., Ex. 6, Jeffrey Barnett Decl., March

27, 2009, ¶¶ 2-3.)  Other recipients of the Publication contacted Barnett through the Publication,

got proposals from Barnett, but did not ultimately sign contracts.  (Barnett Dep. II at 69; Barnett

Dep. at 54.)

  Barnett described the purpose of the Publication as the following:

> It had many purposes.  One purpose was to increase the exposure
> of our firm's name and of my name to current and potential clients.
> It was to increase brand recognition of me and our firm to the
> larger community so that we could have relationships with people,
> so we could have discourse when needed.  It was to convey to all
> these constituencies that both myself in particular and our firm in
> general was concerned on areas of concern to these constituencies
> that I talked about was that we were committed to going the extra
> mile, providing great service to people, that we're a quality firm.
> So, that commitment and that concern and competency I guess
> would be – I haven't thought about a tag line or an advertising term
> for it, but it would be somewhere along those lines.

(Barnett Dep. II at 28-29.  See also Barnett Dep. at 74 (stating that name recognition is a

challenge in Toffler's industry and is one of the reasons for the Publication).)  The Publication

was Barnett's chief tool for business development, and it was his way of increasing networks and

contacts for the firm.  (Barnett Dep. II at 30; McLauthlin Dep. at 19.)

  In a given year, Toffler serves 100 to 200 clients.  (Barnett Dep. at 20-21.)  At any one

time, the firm iserves somewhere on the order of 20 to 30 clients.  (McLauthlin Dep. at 13

(estimating that the firm had 30-40 clients at a time); Johnson Dep. at 20-21 (estimating that the firm had a maximum of 20 clients at any given time).)

      D.      Toffler's Defense Against IWP's Claims and Hartford's Denial of Coverage

In May 2007, Toffler retained the law firm of Pepper Hamilton to defend it against IWP's claims. (McLauthlin Dep. at 23, 51-53, 82; Hartford Mot. for Summ. J., Ex. 19, Dengler Investigation Notes ("Dengler Investigation Notes") Sept. 26, 2008, 04:44:27 PM (stating that Toffler retained Pepper Hamilton in May 2007); Hartford's Mot for Summ. J., Ex. 10, E-mails between Gregory and Serritella, June 2007.)

On September 25, 2007, Toffler tendered a business liability insurance claim to Hartford and requested defense and indemnification against IWP's copyright action. (Hartford Mot. for Summ. J., Ex. 15, Toffler Notice of Claim, Sept. 25, 2007.) Julie Dengler, a senior claims consultant for Hartford, investigated the claim. (See Dengler Investigation Notes; Hartford Mot. for Summ. J., Ex. 16, Julie Dengler Dep. ("Dengler Dep. I") at 24-25; Hartford Mot. for Summ. J., Ex. 17, Dengler E-mail to McLauthlin, Sept. 26, 2007. )

Dengler reviewed the Publication, saw that Barnett just compiled news articles that did not mention Toffler, and saw that Barnett did not write that the readers of the Publication should call Toffler if they ran into problems. (Toffler Cross-Mot. for Summ. J., Ex. 7, Julie Dengler Dep. ("Dengler Dep. II") at 56.) Dengler thereby concluded that Toffler did not distribute the Publication for the purpose of inducing the purchase of services. (Dengler Dep. II at 56.) In her investigation, Dengler also spoke with McLauthlin, who told her that the Publication was a compilation of things that Barnett found interesting and thought clients or contacts might find interesting as well. (Dengler Dep. II at 58-59; Hartford Mot. for Summ. J., Ex. 18, Email from

Catalano to Ament de Nunez, Oct. 1, 2007 (quoting a Sept. 27, 2008, E-mail from Dengler to

Catalano).)  Dengler relied on what McLaughlin had told her and concluded that Barnett

distributed the Publication as "just a transfer of information."  (Dengler Dep. I at 58, 73-74 .)

She did not speak to Barnett or any other Toffler employees, and she did not know what Barnett

articulated as his purpose for distributing the Publication .  (Dengler Dep. II at 59, 61; Dengler

Dep. I at 74.)

Dengler concluded that the Publication "was directed to 150 specific clients and does not

constitute 'widespread public distribution.'"  (Dengler Letter II at 5.)  She also concluded that the

Publication "was principally a medium to convey information and was not advertisement."

(Dengler Letter II at 5.)

On October 4, 2007, Toffler filed an Answer to IWP's copyright action.  (Hartford Mot.

for Summ. J., Ex. 11, Toffler Answer to IWP.)  In its Answer, Toffler admitted

> that Barnett reproduced some articles and portions of articles from
> the named IWP publications along with articles and portions of
> articles from diverse other sources, compiled them into a topically
> organized mailing, informally named "Morning Brew" ("MB"),
> and that he e-mailed MB to a select group of friends and
> associates.

(Toffler Answer to IWP ¶ 12.)

On October 31, 2007, Hartford declined to defend and indemnify Toffler against the

copyright action.  (Hartford Mot. for Summ. J., Ex. 20, Letter from Dengler to Toffler, Oct. 31,

2007 ("Dengler Letter I").)  Hartford reasoned, *inter alia*, that the allegations in IWP's Complaint

did not meet the Policy's definition of "personal and advertising injury."  (Dengler Letter I at 5.)

On December 10, 2007, Toffler demanded that Hartford reconsider its denial of coverage.

(Hartford Mot. for Summ. J., Ex. 9, Letter from Russell to Dengler, Dec. 10, 2007.)  On

December 13, 2007, Hartford reiterated its denial of coverage.  (Toffler Cross-Mot. for Summ. J.,

Ex. 9, Letter from Dengler to Russell, Dec. 13, 2007  ("Dengler Letter II").)

      Toffler, represented by Pepper Hamilton, continued settlement negotiations with IWP

through the summer and fall of 2008.  (See McLauthlin Dep. at 82-83, 87-95; Hartford Mot. for

Summ. J., Exs. 21-28 & 31 (collectively "Settlement Correspondence") (detailing settlement

discussions between July and October 2007).)  On November 12, 2007, Toffler and IWP settled

the copyright action for $125,000.  (Hartford Mot. for Summ. J., Ex. 29, Settlement and Release

Agreement, Nov. 12, 2007 ("Settlement Agreement").)  Although the settlement negotiations

included the parties varying estimates actual damages, statutory damages, and costs, the final

settlement amount was not allocated to any particular type of claim or damage element.

(Settlement Correspondence; Settlement Agreement; McLauthlin Dep. at 95, 101.)

## II.    Procedural History

      On February 11, 2008, Toffler initiated the instant action by filing suit against Hartford in

the Court of Common Pleas for Philadelphia Count, Pennsylvania.  Asserting diversity

jurisdiction, Hartford removed the action to this Court on March 10, 2009.  On May 1, 2008,

Toffler filed an Amended Complaint.  On September 11, 2008, the Honorable John P. Fullam,

who previously presided over this matter, ordered the entry of the parties' Stipulation and

Confidentiality Agreement.  On November 13, 2008, the action was reassigned to my docket.  On

February 12, 2009, Hartford filed an Amended Answer and Affirmative Defenses.  On May 11,

2009, Hartford filed its Motion for Summary Judgment.  On May 26, 2009, Toffler filed its Cross

Motion for Summary Judgment and a Response to Hartford's Motion.  Hartford Filed a Response

to Toffler's Cross Motion on June 8, 2009.

In its Amended Complaint, Toffler seeks to recover $185,861.97 in damages for the amounts it paid to defend and settle the IWP lawsuit. This figure represents the $125,000 Toffler paid IWP to settle the copyright infringement action and $60,861.97 that Toffler avers it incurred in legal fees and expenses in defending against the copyright infringement action.

## III.    Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. Anderson, 477 U.S. at 248. In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." Seigel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995). On cross-motions for summary judgment, the standard of

review does not change.  Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968).  Each moving party must independently show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Id.; Fed. R. Civ. P. 56(c).

**IV.    Discussion**

The parties agree that the relevant facts are undisputed.  The issue before the Court is the interpretation of the Policy, which is a question of law.  Canal Ins. Co. v. Underwriters at Lloyd's London, 435 F.3d 431, 434 (3d Cir. 2006); Donegal Mut. Ins. v. Baumhammers, 938 A.2d 286, 290 (Pa. 2007).

A.    Applicable Law

In an action brought pursuant to diversity jurisdiction, federal courts apply the choice of law rules of the forum state, which in this case in Pennsylvania.  See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226 (3d Cir. 2007) (citing Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).  In Hammersmith, the Third Circuit clarified that Pennsylvania applies an "interest/contacts" choice of law analysis in the context of insurance coverage actions.  Id. at 227-228 (noting that Pennsylvania adopted the interest/contacts approach for contracts cases in Budtel Assoc. v. Cont'l Cas. Co., 915 A.2d 640 (Pa. Super. Ct. 2006)).

Under Pennsylvania law, a court's first choice of law determination is whether there is a true conflict between the substantive laws of the competing states.  See Budtel, 915 A.2d at 643.  "If no conflict exists, further analysis is unnecessary."  Id. (citations omitted).  "If there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply."  Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006).

Three states are involved in this breach of contract action: Pennsylvania, the forum state;

Massachusetts, the state of Plaintiff's headquarters and the state where the Policy was negotiated and delivered; and Virginia, IWP's domicile and the state from which the Publication was distributed by e-mail.  The parties agree that the laws of these three states are consistent with respect to the principles that govern insurance coverage disputes.  This Court concurs.  Thus, no choice of law analysis is necessary.

Under the laws of Pennsylvania, Massachusetts, and Virginia, the terms, conditions, and definitions of an insurance policy are to be given their "plain meaning" and applied as written, unless some ambiguity appears.  Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999) (citation omitted) (discussing Pennsylvania law); Central Mut. Ins. Co. v. Boston Tel., Inc.,  486 F.Supp.2d 180, 183 (D. Mass. 2007) (citation omitted) (discussing Massachusetts law); Transcon. Ins. Co. v. Caliber One Indem. Co., 367 F.Supp.2d 994, 1001 (E.D. Va. 2005) (applying Virginia law).  A policy term is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense by reasonably intelligent people, considering the term in the context of the entire policy.  Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999).  If the policy language is ambiguous, the meaning must be construed in favor of the insured.  Cody v. Connecticut Gen. Life Ins. Co., 439 N.E.2d 234, 237 (Mass. 1982); Bateman v. Motorists Mut. Ins. Co., 590 A.2d 281, 283 (Pa. 1991); First Am. Title Ins. Co. v. Seaboard Sav. & Loan Assoc., 227 Va. 379, 384-385 (Va. 1984).  Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense."  Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986) (citations omitted).

An insurance policy's terms should be given their natural and ordinary meaning as

understood in the business world.   Solers, Inc. v. Hartford Casualty Ins. Co., 146 F.Supp.2d 785, 789 (E.D.Va. 2001) (citation omitted).  A court must construe the meaning of insurance policy terms by reading an insurance policy as a whole.  Frog, Switch & Mfg. Co., 193 F.3d at 746.

### B.   Duty to Defend

An insurer's duty to defend an insured is separate from and broader than the duty to indemnify.  General Acc. Ins. Co. of America v. Allen, 692 A.2d 1089, 1095 (Pa. 1997); Erie Ins. Exch. v. Claypoole, 673 A.2d 348, 355 (Pa. 1996).  To determine whether an insurance carrier has a duty to defend, a court must review the insurance policy language and the language of the factual allegations in the underlying complaint.  Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 896 (Pa. 2006); Mut. Benefit Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999).  It is improper for a court to look beyond the underlying complaint and the insurance policy to determine whether an insurer had a duty to defend.  Kvaerner Metals, 908 A.2d at 896.  The duty to defend arises whenever an underlying complaint may "potentially" come within the insurance coverage.  Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999); Claypoole, 673 A.2d at 355 ("Only allegations contained within the underlying complaint pertaining to injuries which are either actually or potentially within the scope of the insurance policy obligate the insurer to defend the insured.")  "If the complaint against the insured avers facts that would support a recovery covered by the policy, then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy does not cover."  General Acc. Ins. Co., 692 A.2d at 1095.  "An insurer is relieved of the duty to defend only when it clearly appears from the initial pleading that the insurer would not be liable under the policy contract for any judgment based upon the

allegations."  Superperformance Intern., Inc. v. Hartford Cas. Ins. Co., 203 F.Supp.2d 587, 592

(E.D. Va. 2002) (internal quotation and citation omitted).

The Court first reviews the allegations in IWP's Complaint.  The Complaint alleges that

IWP is the owner of copyrights in articles published in certain weekly serials.  (IWP Compl. ¶ 9.)

It also alleges that "Toffler and/or Barnett selected and reproduced articles from [IWP's]

Copyrighted Works and distributed the articles to many recipients in issues of a serial entitled

*Morning Brew*," and that the May 2, May 7, and May 14, 2007, issues of *Morning Brew* each

contained several of IWP's copyrighted works.  (IWP Compl. ¶¶ 12-13.)  The Complaint also

alleges that "Barnett distributed the Infringing Works through a Toffler e-mail server" within the

scope of his employment by Toffler, and he "instructed the recipients of the Infringing Works to

contact him via his 'toffler.com' e-mail address."  (IWP Compl. ¶¶ 15-16.)

The Court finds that Hartford had a duty to defend Toffler under the advertising injury

provision of the Policy.  Nothing in the language of IWP's Complaint indicates that the

Publication could not be covered by the advertising injury provision of the Policy.  IWP's

Complaint alleges that Barnett distributed the Publication, which it described as "a serial"

containing articles, to "many recipients."  The "many recipients" allegation supports that the

Publication had widespread distribution, as required by the Policy's definition of an

advertisement.  The Complaint does not allege any facts that would cause the reader to believe

that the distribution was not public, which would have removed it from advertising injury

coverage under the Policy.  IWP attached copies of the Publication to its Complaint of copyright

infringement.  The attached copies of the Publication included Toffler's name, references to

Toffler's books, and the Toffler watermark.[1]  Nothing in IWP's Complaint explicitly excludes

IWP's claims from coverage under the Policy.  Therefore, Hartford could not conclude that it

"would not be liable under the policy contract for any judgment based upon the allegations," and

thus it had the duty to defend.

Hartford contends that, if it had a duty to defend Toffler, that duty expired on October 4,

2007, when Toffler filed an Answer to IWP's Complaint, admitting that Barnett e-mailed the

Publication "to a select group of friends and associates."  (See Toffler Answer to IWP ¶ 12.)  The

Court disagrees.  Although that argument may be considered under Massachusetts law, the law in

Pennsylvania is clear that it is improper for a court to look beyond the underlying complaint and

the insurance policy to determine whether an insurer had a duty to defend.  Kvaerner Metals, 908

A.2d at 896 ("The Superior Court erred in looking beyond the allegations raised in Bethlehem's

Complaint to determine whether National Union had a duty to defend Kvaerner and in finding

that the Battery's damages may have been the result of an 'occurrence.'  In doing so, it departed

from the well-established precedent of this Court requiring that an insurer's duty to defend and

indemnify be determined solely from the language of the complaint against the insured.")  But cf.

Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1158 (Mass.

1989) ("[T]he duty to defend is based on the facts alleged in the complaint and those facts which

are known by the insurer.") (citation omitted).  Here, the law of Pennsylvania, the forum state

---

[1] Hartford emphasizes that Toffler's name was not on the Publication until January 2007 and that the "Tofflerization" of the Publication occurred gradually since 2003, when Barnett began working for Toffler.  Nonetheless, it is undisputed that the Tofflerization of the Publication was complete when Barnett distributed the issues of the Publication that allegedly infringed Hartford's copyrights.  The previous formats of the Publication are irrelevant to whether Hartford had a duty to defend Toffler against IWP's claims.

applies, and this Court looks only to IWP's Complaint and the Policy to determine Hartford's duty to defend.

C.      Duty to Indemnify

The Court has ruled that Hartford had the duty to defend Toffler against IWP's copyright infringement claims.  Because the law is clear that the duty to defendant is separate from the duty to indemnify, this Court shall address the duty to indemnify separately from its ruling on the duty to defend.

The parties disagree as to whether IWP's copyright infringement suit is covered by the Policy, and, thus, whether Hartford has the duty to indemnify Toffler for the funds it paid to settle the copyright action.  There are three primary disputes: 1) whether the purpose of distributing the Publication was to induce the sale of services; 2) whether the Publication had widespread public dissemination or distribution; and 3) whether the Publication was distributed in an interactive communication via a computer network.

1.      The Publication was Distributed for the Purpose of Inducing the Sale of Toffler's Services

Toffler has presented significant testimonial evidence that Toffler and Barnett's subjective purpose in distributing the Publication was for business development, networking, and exposure of the Toffler company, which would in turn bring sales of its services.  However, the Court must interpret the purpose portion of the Policy's definition of advertisement by using an objective standard.  See Princeton Ins. Co. v. Kosoy, Civ. No. 98-4985, 1999 WL 79055, *2 (E.D. Pa. Feb. 9, 1999) ("an objective standard is applied to determine the interpretation of policy coverage language"); aff'd 281 F.3d 223 (3d Cir. 2001).  Courts must interpret insurance

policy language according to "what a reasonable person in the position of an insured would understand the words to mean." Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 814 (3d Cir.1994). Here again, if a reasonable person in the position of the insured would find the language to be ambiguous, a court must find in favor of the insured. Id. In other words, the Court must decide whether a reasonable purchaser of business liability coverage would understand Hartford's policy defining "advertisement" to include a newsletter distributed for the subjective purpose of inducing the sale consulting services. It does not matter whether newsletter recipients would readily identify the newsletter's purpose as such.

The Court finds that a reasonable person in Toffler's position would have understood and expected that the Publication would fall within the Policy's description of "information or images that has the purpose of inducing the sale of goods, products or services." There are numerous objective indicia that, prior to the alleged copyright infringement, Barnett made changes to the Publication that caused the Toffler name and Toffler themes to appear throughout the Publication – in the title, in the footnote, on the watermark, etc. It is undisputed that the Publication organized news articles under the headings of Alvin Toffler's books, according to which Toffler's services are themed. It is also undisputed that Barnett sent the Publication to various persons in the industries from which Toffler had sold its services in the past or might sell its services in the future. Furthermore, there is no evidence on the record that supports any alternative reason why Toffler, a for-profit consulting firm, or its employee Barnett would send the Publication to 300 persons outside of the company if not to induce sales of Toffler's services.

Hartford argues that the Court must construe "purpose" by considering whether a reasonable person – not specifically a reasonable purchaser of liability insurance – would have

understood the purpose of the Publication was to induce the sale of Toffler's services.  In support of its argument, Hartford points out that certain provisions of the Policy expressly reference intent from "the standpoint of the insured," but no such language appears in conjunction with the word "purpose" in the Policy's definition of advertisement.  Even if the Court were to agree with Hartford's argument, it would reach the same conclusion: that the evidence of record, including the format of the Publication at the time of the alleged copyright infringement – would cause a reasonable person to understand the purpose of the Publication was to induce the sale of Toffler's services.[2]

2.    Widespread Public Dissemination

The Court finds that Barnett's e-mail distribution of the Publication was not widespread and public, as required for coverage under the Policy, and thus Hartford has no duty to indemnify.

To be covered under the Policy, an "advertisement" must be distributed in a widespread and public manner.[3]  The Policy does not define "widespread" or "public."[4]  Contract law is clear

---

[2] The Court declines to follow a Western District of Pennsylvania holding that advertising " 'must involve actual, affirmative self-promotion of the actor's goods or services' and a mere motive to maintain business relations or increase business in some tangential way" is not sufficient.  USX Corp. v. Adriatic Ins. Co., 99 F.Supp.2d 593, 618 (quoting Erie Ins. Group v. Sear Corp., 102 F.3d 889, 894-95 (7th Cir.1996)).  The USX Corp. court drew its holdings from from jurisdictions whose law is not relevant to the instant case.  The Court also declines to follow a Massachusetts Appeals Court ruling that defined advertising "in ordinary usage" as "a public announcement to proclaim the qualities of a product or point of view."  Smartfoods, Inc. v. Northbrook Prop. and Cas. Co., 618 N.E.2d 1365, 1368 (Mass. App. Ct. 1993), because, in this case, advertisement is explicitly defined in the Policy, making reliance upon an "ordinary usage" definition unnecessary.

[3] The Court rejects Toffler's argument that the word "public" is functionally synonymous with "widespread" in the Policy.  The Court must avoid interpreting the Policy in a way that

about how the Court must proceed in this circumstance.  Because "widespread" and "public" are commonly used terms, the Court must look to their ordinary meaning.  Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 897 (Pa. 2006) ("Words of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense.") (citation omitted).  The Court may consult the dictionary definition of a word to determine its ordinary usage.  Id.

Dictionary definitions of "widespread" and "public" are consistent.  For example, Webster's Dictionary defines "widespread" as "(1) widely extended or spread out; (2) widely circulated or diffused; generally prevalent," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 2613 (1993), and the American Heritage Dictionary defines "widespread" as "(1) Spread or scattered over a considerable extent; (2) Occurring or accepted widely," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 4th Ed., available at http://dictionary.reference.com/browse/widespread.  Webster's Dictionary defines the adjective "public" as "of, relating to, or affecting the people as an organized community," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 1836 (1993), and the

---

makes any term meaningless or superfluous.  Girard Trust Bank v. Life Ins. Co. of N. Am., 364 A.2d 495, 498 (Pa. Super. 1976); Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 36 (1st Cir. 2008) (applying Massachusetts law); City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 628 S.E.2d 539, 541 (Va. 2006).

[4] The parties have presented very limited case law to shed light on what "widespread" and "public" mean in the context of this Policy, and the case law the parties have presented has been readily distinguishable from the facts of this case.  Nonetheless, the parties concur that no relevant authority has held that a certain minimum number or variety of recipients is required in order for a distribution to be widespread or public.  They also concur that when a company sends proposals to seven specific companies, that is not public dissemination of an advertisement.  See Smartfoods, 618 N.E.2d 1365.

American Heritage Dictionary defines "public" as "of, pertaining to, or affecting a population or a community as a whole; (2) done, made, acting, etc., for the community as a whole; (2) open to all persons," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 4th Ed., available at http://dictionary.reference.com/browse/public

Barnett distributed the Publication to the e-mail addresses of approximately 300 persons in the defense industry, the intelligence community, and corporate America, including current and former Toffler clients.  Even with the arguably small market for Toffler's services, the Court finds that the Publication's distribution was not "widespread."  See Solers, 146 F.Supp.2d at 795 ("[F]or companies with small markets, the Court must examine advertising in the context of the overall universe of customers to whom an advertising communication may be addressed.").  In order to have a widespread distribution among the defense industry, the intelligence community, and corporate America, Toffler certainly would need to distribute or disseminate the Publication to more than 300 persons.  Furthermore, the Publication was not made available to the public at large or even Toffler's market as a whole.  Therefore, the Court finds that the Publication was so targeted as to make it fall outside of the ordinary meaning of the words "widespread" and "public."

In deciding whether this Publication was given widespread and public distribution, the Court is also guided by the interpretive canon *ejusdem generis*, which refers to the principle that "where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to the persons or things of the same general kind or class as those specifically mentioned."  Steele v. Statesman Ins. Co., 607 A.2d 742, 743 (Pa. 1992) (quoting

BLACK'S LAW DICTIONARY 270 (5th Ed. 1983)).  In other words, "general terms following an

enumeration of specific terms should be construed with reference to the specific terms."  Royal

Ins. Co. (U.K.) Ltd. v. Ideal Mut. Ins. Co., 649 F.Supp. 130, 135 (E.D. Pa. 1986) (applying

Pennsylvania law to a contract dispute).  Cf. Affiliated Food Distrib., Inc. v. Local Union No.

229, 483 F.2d 418, 420 (3d Cir. 1973) ("It is, of course, well established that contract language

must be read in context and that a subsequent specification impliedly limits the meaning of a

preceding generalization.") (internal quotation and citation omitted).  The Pennsylvania Supreme

Court has found this canon to be instructive in interpreting insurance contracts, and this Court

finds the canon to be instructive in the instant case.  See Steele, 607 A.2d at 743.

   The Policy enumerates several advertising media that could satisfy its requirement for

widespread public distribution of an advertisement:

> "Advertisement" means the widespread public dissemination of
> information or images that has the purpose of inducing the sale of
> goods, products or services through:
>
> a.    (1)    Radio;
>       (2)    Television;
>       (3)    Billboard;
>       (4)    Magazine;
>       (5)    Newspaper;
>
> b.    The Internet, but only that part of a web site that is
>       about goods, products or services for the purposes
>       of inducing the sale of goods, products or services;
>       or
>
> c.    Any other publication that is given widespread
>       public distribution.

(Policy § G(1)).  Plaintiff contends that the Publication is an example of "[a]ny other publication that is given widespread public distribution."  The Court agrees that a newsletter distributed via e-mail *could* fall within the § G(1)(c) catch-all category.  However, an advertisement's medium of distribution does not determine coverage under the Policy.  An "advertisement" distributed through one of the enumerated media in Section G(1) of the Policy is not necessarily widespread or public.  For instance, if a billboard were erected inside a locked barn, any "advertisement" printed on that billboard probably would not have the public dissemination required for coverage under this Policy.  Likewise, if a disputed "advertisement" were printed within a magazine of which only a single copy was ever released by the publishers, that "advertisement" probably would not have the widespread distribution required for coverage under this Policy.  Under the Policy, *any* publication could contain a covered advertisement so long as the images or information contained within that publication were given widespread public dissemination and had the purpose of inducing sales.  (Policy § G(1)(c).)  The fact that a publication was distributed to certain recipients via e-mail is not dispositive of whether it was given widespread and public distribution.[5]

---

[5] Hartford attempts to exclude e-mail from the realm of media that could be public.  The Court notes a newspaper or magazine could be sent only to selected recipients, just as the Publication was sent only to the persons on Barnett's e-mail distribution list.  In support of its argument, Hartford directs this Court to dictum in Zeran v. America Online, Inc., 958 F.Supp. 1124, 1127 (E.D. Va. 1997), where that court distinguishes between "private communications such as electronic mail, and public communications."  The Zeran case involves a claim of negligent distribution of defamatory material, not a claim of advertising injury, and therefore it is not relevant to the interpretation of the word "public" in this context.  Likewise, Joseph v. Leavitt, 386 F.Supp.2d 487 (S.D. N.Y. 2005), which distinguishes between "private e-mail" and items "spoken or posted in any public forum," is inapposite because the analysis is in the context of a First Amendment action, not an advertising injury claim.

The enumerated advertising media within Section G(1) of the Policy help the Court interpret what types of distribution would be widespread and public under the Policy.  The enumerated media in Section G(1) are generally open to the public at large, without limitation. In the case of radio, television, or billboard, the potential for unlimited viewership is obvious. Although it is possible that a magazine or newspaper is mailed or delivered only to persons on a list of subscribers, usually magazines and newspapers are also available for purchase by the public at large.  That was not the case with Toffler's Publication.  The publication was distributed by e-mail to approximately 300 specific persons who were known to Barnett or his colleagues or who were associates of persons already on the distribution list.  Toffler did not provide a means by which other members of the public could even become aware of the Publication, nevermind access a copy of it if they were inclined to do so.

Reading the Policy's definition of advertisement as a whole, the court finds that Barnett's e-mail distribution of the Publication to approximately 300 persons outside of Toffler was not widespread public dissemination, as required by the Policy in order to trigger Hartford's duty to indemnify.

3.      Interactive Conversation Through a Computer Network

Hartford argues that the Publication is excluded from coverage under the Policy, which states that an advertisement does not include "an interactive conversation between or among persons through a computer network."  (Policy ¶ G(1).)  Hartford contends that the Publication is excluded by this provision because Barnett sent the Publication via e-mail and instructed recipients to contact him via his toffler.com e-mail address.  The Court rejects this argument as

having no merit.  There is no evidence that the Publication was a conversation, in the normal use

of that word.  Thus, the Publication is not excluded from coverage by the "interactive

conversation" clause of the Policy.

D.    Damages

Hartford contends that its duty to defend Toffler against IWP's copyright claims should

be reduced because Toffler did not request defense and indemnification as promptly as was

required by the Policy.  Hartford argues that the request for defense under the Policy was

untimely and that the legal fees incurred before the request for defense should be excluded from

any damages award.

The relevant Policy provisions are as follows:

**Duties In The Event Of Occurrence, Offense, Claim Or Suit**

 **a.** **Notice Of Occurrence Or Offense**

  You or any additional insured must see to it that we
  are notified as soon as practicable of an
  "occurrence" or an offense which may result in a
  claim.  To the extent possible, notice should
  include:

  (1) How, when and where the "occurrence" or
   offense took place;

  (2) The names and addresses of any injured persons and
   witnesses; and

  (3) The nature and location of any injury or damage
   arising out of the "occurrence" or offense.

 **b.** **Notice Of Claim**

  If a claim is made or "suit" is brought against any
  insured, you or any additional insured must:

  (1) immediately record the specifics of the claim

or "suit" and the date received; and

(2)    Notify us as soon as practicable.

**c.    Assistance And Cooperation Of The Insured**

You and any other involved insured must:

(1)    immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2)    Authorize us to obtain records and other information;

(3)    Cooperate with us in the investigation, settlement of the claim or defense against the "suit"; and

(4)    Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.    Obligations At The Insured's Own Cost**

No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(Policy § E(2).)

The law in Pennsylvania is clear that an insurance company need not only prove that the notice provision of an insurance policy was breached but also that it suffered prejudice as a consequence.  Brakeman v. Potomac Ins. Co., 371 A.2d 193, 196 (Pa. 1977).  Although Brakeman involved an insurance company's attempt to forfeit coverage under the policy, this Court has found no authority to indicate that the law should be applied differently in this case, where Hartford seeks to reduce the amount of defense coverage it is obliged to provide to Toffler.  See Brakeman, 371 A.2d at 196 ("A strict contractual approach is also inappropriate here because what we are concerned with is a forfeiture. . . . [T]o find that the carrier may forfeit

the coverage, even though there is no likelihood that it was prejudiced by the breach . . . would be unfair to insureds.") (internal quotation and citation omitted).

Hartford has failed to provide any evidence that it was prejudiced by the time that elapsed between May 7, 2007, when IWP informed Toffler of its belief that Toffler had violated certain copyrights (or, in the alternative, August 16, 2007, when IWP initiated a copyright infringement action against Toffler and Barnett), and September 25, 2007, when Toffler requested a defense from Hartford against IWP's claims. Therefore, the Court shall not reduce the costs of defense that Hartford must pay Toffler.

The Court shall require Hartford to pay the sum of $60,861.97 to Toffler to cover Toffler's costs of defense against IWP's suit.

## V.   Conclusion

The Court holds that Hartford had the duty to defend Toffler against IWP's claims of copyright infringement. The Court also holds that Hartford does not have the duty to indemnify Toffler for the amount of money Toffler paid to IWP to resolve the copyright claims. On Toffler's claim for defense, summary judgment will be granted in favor of Toffler and against Hartford, and Hartford shall pay to Toffler the costs of its defense against IWP's suit. On Toffler's claim for indemnification, summary judgment will be granted in favor of Hartford and against Toffler.

An appropriate Order follows.